New Departure Division of General Motors Corporation *v.* Town and City of Bristol et al.

Court of Common Pleas    Hartford County    File No. 71487

Decided September 27, 1963

*Donovan & Donovan,* of Bristol, for the plaintiff.

*Edward C. Krawiecki,* corporation counsel, for defendant city of Bristol.

Plaintiff, New Departure Division of General Motors Corporation, a Delaware corporation qualified to do business in Connecticut and operating large factories for the manufacture of ball bearings in Bristol and Meriden, seeks a reduction in the assessment of its personal property consisting of machinery and inventory located in the town and city of Bristol on October 1, 1957. Having been denied relief by the board of tax review, plaintiff

commenced this action on May 28, 1958. The matter was referred to the late Chief Justice William M. Maltbie, as state referee, to take evidence and render a report to the court. A trial which lasted six weeks was conducted before Judge Maltbie in May and June of 1960. Thereafter briefs were exchanged, oral argument was had and, at Judge Maltbie's direction, plaintiff submitted proposed findings of fact and conclusions of law, and a memorandum in support thereof. Judge Maltbie died before writing his report, whereupon on May 24, 1962, the matter was, by stipulation, referred to me for decision on the record made before Judge Maltbie, the briefs and proposed findings submitted to him, and such additional argument as might be found helpful.

Seventeen other cases, protesting the personal property assessments of plaintiff and five other Bristol manufacturers in the grand lists of 1957, 1958 and 1959, are pending, it having been stipulated that their outcome will be controlled by the final decision in this case. Having read the more than 3000 pages of testimony, having examined the 45 trial exhibits, having read the more than 250 pages of briefs and supporting materials, and having heard oral argument, I make the following report.

For purposes of the grand list of October 1, 1957, it was the practice of the board of assessors and the board of tax review of the town and city of Bristol to value all property for the purpose of taxation at 50 percent of fair market value as of such date. The practice of assessing property at a percentage of fair market value was held invalid in *E. Ingraham Co.* v. *Bristol*, 144 Conn. 374, 380 (May 17, 1957), but was validated by the General Assembly at its 1957 session by Public Act No. 673

(§§ 6, 7), effective June 21, 1957, which is applicable to this case and which now permits assessors to assess at a given percentage. See General Statutes §§ 12-64, 12-71. The Bristol board of assessors applied said rule in valuing personal property of plaintiff for taxation on the grand list of October 1, 1957, and found and fixed the fair market value of plaintiff's property as of said date to be as follows:

| | | |
|---|---|---|
| 1. | Machinery and equipment | $22,158,180 |
| 2. | Furniture, fixtures and office equipment | 302,260 |
| 3. | Average inventory | 10,248,520 |
| 4. | Tools, dies and jigs | 258,600 |
| | Total | $32,967,560 |

In accordance with the Bristol assessment practices, plaintiff's aforesaid personal property was assessed on the October 1, 1957, list at 50 percent of the aforesaid values, namely $16,483,780. Plaintiff then took an appeal under § 12-111 of the General Statutes to the board of tax review, claiming that the aforesaid valuations and assessment were manifestly excessive in themselves and nonuniform with the valuations and assessments placed against substantial amounts of other property in Bristol, principally residential real estate and merchants' inventories. The board of tax review denied relief, and plaintiff thereupon perfected an appeal under § 12-118 of the General Statutes to the Court of Common Pleas. Plaintiff also seeks relief under § 12-119, claiming that under all the circumstances the aforesaid assessment "was manifestly excessive and could not have been arrived at except by disregarding the provisions of the statutes for determining the valuation of such property." The Common Pleas Court has jurisdiction under both stat-

utory provisions and has the power to grant relief if the plaintiff is entitled thereto.

The applicable statutes which govern the disposition of this case are §§ 12-71, 12-64 and 12-63. These statutes provide that personal property shall be set down in the list of the town where the owner resides and shall be liable to taxation at a percentage, not exceeding 100 percent, of "present true and actual value," which percentage must be uniform for all types of property, personal and real. A pertinent discussion of these statutes and of the Supreme Court opinions construing them is contained in a memorandum of decision by Judge Parmelee in *Burritt Mutual Savings Bank* v. *New Britain,* Court of Common Pleas, Hartford County, No. 73641 (Mar. 25, 1960). Judge Parmelee's opinion reads:

"The 'present true and actual value' of taxable property is defined to be 'the fair market value thereof and not its value at a forced or auction sale.' [General Statutes § 12-63.] 'The expressions "actual valuation," "actual value," "market value," "market price," and . . . "fair value" are synonymous.' *Sibley* v. *Middlefield,* 143 Conn. 100, 106; *National Folding Box Co.* v. *New Haven,* 146 Conn. 578, 584. Section 12-118 . . . requires that . . . [the Court of Common Pleas] must, on appeal, determine judicially whether the appellant has been aggrieved by action on the part of the Board of Assessors . . . [which] would result in the imposition of an unjust tax. If it determines that he has been aggrieved by action on the part of the Board of Assessors, the court must then proceed to exercise a broad discretionary power to grant relief. *Sibley* v. *Middlefield,* supra, 105; *National Folding Box Co.* v. *New Haven,* supra, 585. The figure fixed by sales in ordinary business transactions of property similar in nature in the same or a comparable

location is ordinarily a reliable test of market value, since a generally acceptable definition of market value is the price that in all probability results from fair negotiations where the seller is willing to sell and the buyer desires to buy. In the present cases evidence of sales of comparable property in this community was either not helpful or not available. However, property may be found to have a market value in the absence of evidence of other sales of like property in the open market. *Portland Silk Co.* v. *Middletown,* 125 Conn. 172, 174. Various methods have been recognized to be proper, no one method being controlling. *National Folding Box Co.* v. *New Haven,* supra; *Burritt Mutual Savings Bank* v. *New Britain,* 146 Conn. 669, 674. The methods do not establish value themselves but are merely aids in the ascertainment thereof. *Burritt Mutual Savings Bank* v. *New Britain,* supra.

"The experts who testified for each of the parties in the instant cases agreed that theoretical methods of establishing value must necessarily be employed and that in the use of these methods a number of factors and elements are involved requiring careful consideration, with the final result that mathematical accuracy is not necessarily achieved. In situations where mathematical calculations must be relied upon for the determination of value, much caution is required because those calculations, although made in the best of faith, can lead to widely divergent results. All of the methods used must therefore be closely scrutinized and consideration should be given to them all if they have been utilized in arriving at the value of the property. No one method is controlling. The process of estimating the value of property for taxation is, at best, one of approximation and judgment and there is a margin for a difference of opinion. The law contemplates that a wide discretion is to be accorded to assessors,

and unless their actions are discriminatory or so unreasonable that property is substantially overvalued and thus injustice and illegality result, their opinion and judgment should control in the determination of value for taxation purposes. *Burritt Mutual Savings Bank* v. *New Britain*, supra, 675.

"On appeal, the contesting taxpayer must establish that the assessment is unjust and will result in his being required in effect to pay an illegal tax. All of the evidence of the experts testifying as to valuation and the methods of arriving at such valuation is to aid the trier in arriving at a conclusion which, from the very nature of the problem, must of necessity be a matter of opinion, based on all the evidence, and on the knowledge and experience of the witnesses as disclosed by that evidence. *Bridgeport Hydraulic Co.* v. *Stratford*, 139 Conn. 388, 397; *National Folding Box Co.* v. *New Haven*, supra. The value of the plaintiff's property was required to be determined largely by use of a mathematical process and therefore the plaintiff had the burden of proof to establish that the factors employed in that process by the defendant were improper and resulted in an unjust and illegal assessment."

Judge Parmelee found for the taxpayer in the *Burritt Mutual Savings Bank* case and held that the assessment was grossly excessive, saying: "The methods used by defendant's expert included factors and erroneous assumptions of fact which affected mathematical calculations to the extent that property was substantially overvalued resulting in an excessive assessment."

As in the *Burritt Mutual Savings Bank* case, the valuations of plaintiff's machinery and equipment and furniture, fixtures and office equipment used by the defendant town and city of Bristol, hereinafter

called the defendant, in preparing the 1957 list were computed by an artificial mathematical process utilizing a Marshall and Stevens comparative equipment cost index, a method introduced by a professional appraisal firm, the J. M. Cleminshaw Company. The computation was made by a Cleminshaw appraiser named Burkhard as follows: He obtained plaintiff's original acquisition costs by years for the aforesaid items of personal property located in Bristol on October 1, 1957. Using a Marshall and Stevens index number for the metal working industry, he wrote up those costs for machinery and equipment to 1957 price levels. The result was to inflate such original acquisition costs totaling $31,822,229 to indexed costs totaling $51,028,642. He then depreciated (first at 5.88 percent per year, but then corrected to 8 percent per year by the assessors) such indexed costs to a 20 percent "floor," the point beyond which no further depreciation is allowed. By the same process, but using an index number for the office equipment industry, he wrote up original acquisition costs for furniture, fixtures and office equipment from $574,513 to an indexed cost of $978,065. Such indexed costs were then depreciated at 10 percent per year to a 20 percent "floor."

This process did not result in "market value," which is the statutory standard for assessment purposes. He did not examine or inspect the machinery in preparing his valuation. He did not have any information whatsoever on its condition or character. All the experts, except this one, agreed that this was indispensable to making a proper market valuation. Nesser, his immediate superior at Cleminshaw, was called by the defendant to support the method employed and confirm the resulting valuation. This expert testified that he could not have valued the machinery in the way it was done by

Burkhard. I do not regard Burkhard's testimony as acceptable or credible.

Defendant's expert Nesser prepared a valuation to support the assessment based upon a so-called "engineering method," employing both the Marshall and Stevens index and the "Iowa curves." Thus, he undertook to prove the validity of the use of the index in the first computation by relying on it as his authority in the second computation. In two other Connecticut towns, defendant's expert Nesser made valuations found by the court to be grossly excessive. In *Burritt Mutual Savings Bank,* supra, he used a "fictitious" method and "factual assumptions" that the court found contrary to the facts. His valuations were excessive by 38 percent. In *Connecticut Light & Power Co.* v. *Monroe,* Court of Common Pleas, Fairfield County, No. 72323 (July 2, 1959) *(LaMacchia, J.),* aff'd, 149 Conn. 450, he used the same Iowa curves approach used here to support the assessment, but the court found his method produced a manifestly excessive valuation. In those cases, as here, he used complicated mathematical formulae as a substitute for an examination of the property and a knowledge of its value and use.

The valuations fixed by the Cleminshaw firm for plaintiff's machinery and equipment and furniture, fixtures and office equipment were determined, therefore, by a mathematical process rather than by comparable market sales or any other recognized appraisal method. This method (after adjustment of the depreciation rate) and the resulting valuations were adopted by the defendant. Plaintiff has established that the Marshall and Stevens index factor employed in that process by the defendant was improper and resulted in an unjust, illegal and manifestly excessive assessment. The defendant

claims that the index factor employed was proper and necessary to compensate for the effect of inflation on machinery values, but the better evidence is to the contrary.

Assuming the usefulness of the index for some purposes, it clearly appeared, from the testimony of the manager of the company compiling the index, called as a witness for defendant, that it is inherently unsound as a measure of the current market value of used machinery and equipment acquired over past years. The reason is that the prices indexed each year are the prices of machines made in that year. Hence a 1957 index is useless in valuing a 1927 machine, because there is no way of knowing how much of the price increase is attributable to inflation and how much to improvements in new machinery.

Plaintiff's original acquisition costs for machinery and equipment were incurred in each year from 1916 through October 1, 1957, inclusive; its similar costs for furniture, fixtures and office machinery were incurred in each year from 1920 through October 1, 1957, inclusive. The index number employed no adjustments for quality improvements as distinguished from price changes caused by inflation. The index number accordingly had the effect of attributing to a 1916 machine the cost of a new improved 1957 machine. This is an arbitrary and improper starting point with which to begin finding the 1957 value of the 1916 machine, because the machines are not comparable.

There is another reason for the inapplicability of such an index to used machinery. While it might be thought that inflation would affect the value of used machinery acquired over past years in the same proportion that it affects the value of new machinery in the current market, the evidence in-

dicates that this is not the case. This is dramatically shown by proof of the actual proceeds from the sale of certain groups of plaintiff's machinery and equipment when compared with the values computed by the defendant's method. The defendant placed a value of $728,077 on certain machinery which was sold from October 1, 1957, through June 30, 1959, to used machinery dealers for only $162,954, or approximately 22 percent of the value computed under the indexing method. Another group of machines valued by the defendant at $1,654,274 was sold for salvage of $87,836 during the period October 1, 1957, through March 31, 1960, the proceeds of sale being approximately 5 percent of the defendant's valuation. These sales were sufficiently close to the assessment date so as to afford a reasonable indication of market value on that date. These examples show the unreliability of the price index employed as a factor in fixing the fair market value of plaintiff's personal property. Indeed, the Cleminshaw appraiser, Burkhard, testified that the method he used to value plaintiff's machinery, and adopted by the defendant, did not purport to arrive at market value.

The index employed failed to achieve its stated purposes and resulted in a grossly excessive valuation of plaintiff's machinery and equipment. Nevertheless, inflation has had some effect upon the dollar measure of the value of used machinery. It was shown that the salvage value (including any part added by inflation) of machinery removed from plaintiff's plants averages less than 10 percent of original cost. Ten percent (or slightly less) of original cost would therefore be a reasonable point at which to stop depreciation. By stopping it instead at 20 percent of original cost, an allowance is made for inflation which, though arbitrary, reaches a result very close to the values established in this

case by actual sales and expert appraisals. No such arbitrary rule may be applied without permitting the taxpayer the benefit of exceptions when he can demonstrate that particular machines have a lower value. An assessment would be invalid if it were based on a rigid rule which would not bend to facts.

The assessment employed both an index to allow for inflation and a 20 percent floor under depreciation. Defendant sought to justify the latter by the unsupported assertion that so long as the property is in use it must have some value. No explanation whatever was attempted for fixing that value at 20 percent of inflated costs, as against any other figure that might have been selected. The taxpayer established, by expert testimony of its witnesses Hall and Knebel, that the mere fact that a machine is in use does not prove that it has any value at all, and certainly not as high as 60 percent of original cost, as used in the assessment. The floor of 20 percent of original cost, subject to exceptions where shown to be excessive, is approved as a substitute for the cost index, not as an addition to it, and as the only reasonable method presented in this case for allowing for inflation. It is approved for that purpose only, and expressly not as a measure of residual value which may be imputed to a machine merely because it is in use.

Recognizing that complete market value appraisals are impractical as a means of determining annually the taxable valuations of a large plant full of machinery, plaintiff undertook to establish such a market value in this one instance, not only to determine the proper assessment for this plant in this year but also to test various formulas which might be used to approximate such values for other years and other plants. To that end, plaintiff presented six computations by different methods to be con-

trasted with the results of defendant's computations.

Plaintiff's first method produced a valuation of $17,023,544 for both machinery and inventory. The machinery portion thereof was arrived at by having all the machines for which there is a ready market appraised by an expert in the used-machinery market, Robert F. Baird; by noting the proceeds of machines actually sold from the plant shortly after the assessment date; by demonstrating, through the expert process engineers Hall and Knebel, the obsolescence to the point of virtually no value of substantial groups of machines; and then imputing to the remaining machinery values estimated by analogy to the established values of the machinery actually appraised, sold, etc. This is an acceptable method, far more reliable than any mere formula.

Plaintiff's second method produced a valuation of $18,657,516 for both machinery and inventory. The machinery portion thereof was an appraisal made after extensive examination of the machinery by the chairman of the board of American Appraisal Company. The figure he developed is what he thought the machinery portion of the plant might be sold for as a whole by a willing seller to a willing buyer for use for its intended purpose of manufacturing ball bearings. This too is an acceptable method, far more reliable than any mere formula.

Plaintiff's third method produced a valuation of $15,567,740 for both machinery and inventory. The machinery portion thereof was done by analogy to the recent sale of a metal working plant in Waterbury. That plant was not sold as a whole, but by numerous negotiated sales of individual machines and groups of machines to persons who would use them for their intended purposes. That plant was

sufficiently comparable to provide a useful standard. Again, this is an acceptable method and far more reliable than any mere formula.

Plaintiff's fourth method produced a valuation of $15,541,582 for both machinery and inventory. The machinery portion thereof was developed from plaintiff's own books by taking book values and making thereto certain adjustments recommended by expert accountants as appropriate for tax valuation purposes. Valuations used by property owners for purposes of reporting to stockholders and to various governmental authorities, and certified by independent certified public accountants, are entitled to considerable weight—more than any mere formula.

The average of these four appraisals is $16,747,846.

Plaintiff then computed the valuation by the so-called "Yellow Card formula" derived from the Connecticut Assessors' Handbook, used in Bristol prior to 1957, and generally throughout the state, without any of the adjustments mentioned elsewhere in this report, producing a result of $17,065,820.

Plaintiff then computed the valuation by the so-called "Connelly formula," recommended by the governor's tax study commission, again without any adjustment, producing a result of $18,057,811.

The so-called "Yellow Card" and "Connelly" formulae come reasonably close to the valuations established by expert appraisals, comparable sales, etc. Accordingly, it appears that the most reasonable short-cut method to use for valuing machinery, etc., is to start with original cost (including freight and installation), depreciate it at a reasonable rate, and stop depreciation at 20 percent of original cost

as an allowance for inflation, except in those instances in which the taxpayer can demonstrate, as has been done for some machines in this case, an actual value of less than 20 percent of original cost. The reasonable rate of depreciation may be that used for federal income tax purposes or, if, as here, that is not available, that used for book purposes. Construction in progress, which includes some items not in the plant and none in use, should be valued at half its cost. Machinery withdrawn from use for disposal should be valued at estimated salvage.

The other factor which resulted in a manifestly excessive assessment was the addition of "factory burden" costs to the work-in-process and finished goods inventory valuations of plaintiff without adding comparable costs to the inventory valuations of merchants. "Factory burden" is the sum of indirect expenses incurred in the factory, e.g., building rent or depreciation, taxes, machinery and equipment depreciation, fuel, supplies, supervisory salaries, and insurance. Adding factory burden increased plaintiff's work-in-process valuation by $3,071,849 and its finished goods valuation by $1,513,190, or a total of $4,585,039.

Plaintiff's inventory is broken down into the following classifications: (1) supplies, (2) obsolete material, (3) raw materials, (4) work-in-process and (5) finished goods. It is the practice throughout Connecticut to value the first three categories for taxation by taking the monthly average of such goods on hand for the year preceding the assessment date, on the basis of invoice cost, or cost or market, whichever is lower, plus freight less 5 percent allowance for shrinkage or breakage. Work-in-process and finished goods are valued for taxation by using the value of materials computed in accordance with inventory standards as defined plus

the cost of direct labor, which is the wages (plus related taxes) paid to those who actually operate the machines which process the materials from raw to finished goods. Factory burden is not used to fix the value for taxation in Connecticut of work-in-process and finished goods. The foregoing is the method recommended by the governor's tax study commission (created by special act in 1957; 28 Spec. Laws 948), which issued its comprehensive report on "Property Taxes in Connecticut" (called the Connelly Report).

The defendant nonetheless contends that factory burden should be included in the computation of plaintiff's work-in-process and finished goods valuations. The parties agree that raw material and direct labor costs should be included. It may well be that some elements of burden contribute to value, but it is clear that other elements do not. Taxes add nothing to value, and taxes are a substantial part of burden. Burden also varies from place to place, from manufacturer to manufacturer, and from plant to plant. The accounting treatment for burden is not uniform and a cost that one manufacturer may include may be excluded by another. Such variations find no corresponding variation in the value of the product. Another important element in burden is depreciation of machinery. The assessments as made include in inventory the full amount of related depreciation booked by the taxpayer, but allow a much smaller rate of deduction from the inflated costs of the machinery when assessing that portion of the property. Thus, depreciation of the machinery is added proportionately to the value of inventory but is not deducted from the value of machinery at the same rate. This is obviously improper double taxation. The exclusion of burden from value for taxation produces a more equitable result than its inclusion. This logical

conclusion was supported by testimony of several of plaintiff's experts. Even if the question affected only manufacturers and no other class of taxpayers, burden should not be considered an element of value.

Another compelling reason for omitting burden from plaintiff's valuations is that other taxpayers, principally merchants, have similar costs—rent, light, heat, taxes, insurance—which are not taxed. Since the statutes require assessments to bear a uniform relation to value, burden cannot be assessed in manufacturers' inventory when it is not assessed in merchants' inventory. One hundred percent assessment is no longer required in Connecticut, but equalization and uniformity are required.

Inventory should be valued at invoice cost (including freight), plus direct labor, less 5 percent allowance for shrinkage, except that obsolete inventory should be valued at salvage.

Plaintiff has fully satisfied its burden of proof and has established that the two principal factors (namely the price index and the inclusion of factory burden) employed in the defendant's valuation method were improper and resulted in an unjust and illegal assessment. It has established that the price index employed did not make adjustments for quality improvements as distinguished from price changes caused by inflation and that the indexed costs had no reasonable relation to the market value of the used machinery and equipment. The actual proceeds from the sale of certain groups of the machinery were far below the values computed by the defendant's indexing method. The defendant's method valued a group of general purpose machines at $6,012,800, whereas an expert market appraisal gave it a replacement market value of $5,079,950; and if such machines were sold, the pro-

ceeds would be one-half of such market value, namely, $2,539,975. An expert for plaintiff made a comprehensive market appraisal of all the machinery and equipment, after a careful examination of the property, and testified that it had a fair market value of $12,000,000, whereas the defendant's abstract mathematical calculation resulted in a value of $22,158,180.

The greatest portion of the time devoted to the six-week hearing was taken up by the testimony of experts on the question of value based upon the different methods employed by them to arrive at a valuation. All of this testimony has been considered and weighed as factors used by experts in making their estimates of value and considered in making my determination that plaintiff's assessment is unjust, illegal and manifestly excessive.

Based upon the credible evidence, it is concluded that the method to be employed to determine the fair market value of plaintiff's taxable personal property on October 1, 1957, is that set out above. This is a practical formula which produces fair and equitable valuations which approximate the statutory standard of fair market value.

It is concluded that the fair market value of the property under consideration and on October 1, 1957, is as follows:

| Inventory | | |
|---|---|---|
| Supplies | $ 484,879 | |
| Less Shrinkage | 24,244 | $ 460,635 |
| Obsolete Material | | 1,620 |
| Raw Materials | 1,147,665 | |
| Less Shrinkage | 57,383 | 1,090,282 |
| Work in Process | 3,254,911 | |
| Less Shrinkage | 162,746 | 3,092,165 |

| | | |
|---|---|---|
| Finished Goods | 1,002,056 | |
| Less Shrinkage | 50,103 | 951,953 |
| Total Inventory | | $ 5,596,655 |
| Fixed Assets | | |
| Machinery | 11,719,283 | |
| Less Exceptions to 20% | | |
| Floor | 1,495,761 | 10,223,522 |
| Furniture and Office | | |
| Equipment | | 278,203 |
| Jigs, Dies and Tools | | 396,849 |
| Total Fixed Assets | | 10,898,574 |
| Total — All Property | | $16,495,229 |

Plaintiff's assessment at 50 percent of said value is fixed at $8,247,614.

I recommend that judgment may enter accordingly.